**Warren KATZ, Plaintiff,**

v.

**ODIN, FELDMAN & PITTLEMAN, P.C., Defendant.**

**No. 1:04CV735.**

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 26, 2004.

Warren Katz, Boca Raton, FL, Pro se.

Frank Douglas Ross, Odin Feldman & Pittleman PC, Fairfax, VA, for Defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

In this diversity defamation action, a pro se plaintiff sues his former law firm with which he disputed a fee, alleging that the

law firm made oral and written defamatory statements in the context of the fee arbitration proceeding. Specifically at issue on a threshold dismissal motion are the following questions:

(i) whether plaintiff's defamation claims are barred by Virginia's one-year statute of limitations where, as here, the defendant's written statements were sent to the arbitration tribunal more than one year before this action was filed, but then were subsequently repeated orally during the arbitration hearing, which occurred less than a year before the filing date.

(ii) whether plaintiff's defamation claim is barred by an absolute privilege where, as here, the written and oral statements alleged as defamatory were made in furtherance, and in the course, of a fee arbitration proceeding.

## I.[1]

Plaintiff Warren Katz, a Florida resident, is the president of Wrenn Associates, Ltd., a Virginia corporation formerly engaged in the business of residential development in Virginia. Defendant, Odin, Feldman & Pittleman (OF & P), is a law firm organized as a professional corporation under the laws of Virginia. Bill Richardson, Timothy J. McEvoy, Kevin T. Oliveira, and Edward W. Cameron are OF & P partners who played roles in the events at issue.

According to the complaint, plaintiff retained Alexander Laufer of Eisenhower, Tarby, and Laufer, P.C. in May 1998 to represent Wrenn in a commercial claim against Lake Manassas L.L.C., a Virginia development and management company. During the course of the representation, Katz took issue with Laufer's assessment of the value of Wrenn's claim against Lake Manassas, and thus Laufer recommended a second opinion on this matter. Thereafter, on or about August 28, 2000, Laufer retained Richardson and McEvoy of OF & P to render this opinion. When Laufer forwarded the bill from OF & P to plaintiff, however, a dispute ensued. Plaintiff, claiming he never authorized the second opinion, refused to pay OF & P's bill for services. Shortly thereafter, on May 25, 2001 Laufer sought, and obtained, leave to withdraw from the case as Wrenn's counsel.

In June 2001, plaintiff contacted McEvoy at OF & P to request that OF & P undertake to represent Wrenn in the case against Lake Manassas. OF & P agreed to do so, but only for a limited purpose. Specifically, by letter dated July 3, 2001, OF & P limited the scope of the representation to an evaluation of a possible copyright claim against Lake Manassas based on the latter's use of architectural plans allegedly copied from plaintiff and Wrenn's plans for townhouses on property adjacent to the Lake Manassas development. In its letter, OF & P noted that it would decline to continue the representation should the investigation disclose that the copyright claim lacked merit. It appears that plaintiff paid OF & P a $2,500 retainer for this representation.

By letter dated September 25, 2001, OF & P notified plaintiff that it was declining to continue the representation because plaintiff had failed to provide original copies of drawings, that OF & P considered necessary to an evaluation of the copyright claim. Plaintiff protested, claiming that he had indeed delivered the requested drawings. When plaintiff sought return of the

---

1. The facts recited here are derived from the complaint. On a threshold motion to dismiss, the allegations of the complaint must be accepted as true and all facts and reasonable inferences must be construed in the light most favorable to the plaintiff. *See Ibarra v. United States,* 120 F.3d 472, 474 (4th Cir.1997).

$2,500 retainer fee, both parties agreed to submit the dispute to voluntary fee arbitration through the Virginia State Bar.[2]

■ By letter dated June 28, 2002,[3] OF & P formally agreed to arbitrate the matter and submitted a position statement to James A. Watson, III, Esq., then Chairman of the Fee Arbitration Committee for the 19th Circuit Committee on the Resolution of Fee Disputes. In its statement, OF & P outlined its argument that plaintiff was not entitled to reclaim the retainer fee paid to OF & P to investigate Wrenn's copyright claim. In support of its claim, OF & P recounted the history of its professional relationship with plaintiff, including, as relevant background, details of plaintiff's previous attorney-client relationship with Alexander Laufer and the legal opinion OF & P provided during the course of that representation. In this case, plaintiff alleges that statements included in the letter defamed his reputation before members of the arbitration panel, and, more broadly, had a potentially adverse effect on his reputation in the legal community by falsely portraying him as a litigious client. Specifically, plaintiff objects to the following three statements in the June, 28 2002 letter:

(i) "Both Mr. Katz and Mr. Laufer agreed it would be useful to obtain a second opinion about Mr. Katz' case from another attorney;"

(ii) "Now, as with Mr. Laufer before, Mr. Katz disagrees with his attorney's judgment. As a result, he wants his money back;" and

(iii) "[N]otwithstanding that he has never paid Mr. Laufer for the opinion letter, it has come to the attention of OF & P that Mr. Katz continues to use it and has given it to his current attorney (Ben DiMuro) for his use in connection with the lawsuit."

Plaintiff alleges that the first statement is defamatory because it falsely recites the facts of plaintiff's relationship with Laufer by suggesting that he had agreed to obtain a second opinion from OF & P when he had clearly stated his objection to this course of action. The second is defamatory in plaintiff's view because he believes it portrays him as a litigious and undesirable client by alleging a pattern of disputed advice and refusals to pay money owed. The significance of the third statement is unclear from the complaint. Presumably, however, plaintiff claims this statement is defamatory because it intimates that he appropriated an opinion letter for which he refused to pay and then gave it to yet another attorney to use on plaintiff's behalf.

The fee arbitration hearing was held on June 30, 2003, more than a year after the date OF & P's letter was sent to the panel,

**2.** The Virginia State Bar Fee Dispute Resolution Program (FDRP) is a voluntary arbitration alternative to civil action, which may be invoked to resolve any dispute over a fee paid, charged, or claimed for legal services rendered by a member of the Virginia State Bar. *See* Fee Dispute Resolution Program, Virginia State Bar, *Program Rules* (2003), *available at* http://state.vipnet.org/vsbar/feerules.html (last visited Aug. 23, 2004). Matters adjudicated before the FDRP are governed by the Virginia Arbitration Act, Va.Code § 8.01–577 *et seq.*, and thus all decisions may be enforced in accordance with that statute.

**3.** A copy of the June 28, 2002 letter was relied on and quoted in plaintiff's complaint, but not attached. As such, the letter is appropriately considered in its entirety in resolving the motion to dismiss. *See* Fed.R.Civ.P. 10(c); *New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 18 F.3d 1161, 1164 (4th Cir.1994) (citing *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991) (holding that the district court could consider documents "integral" to plaintiffs' claims, even if not explicitly incorporated by reference, and permitting defendant to produce these documents when attacking the complaint)).

but within one year (barely) of the filing of this action. At the hearing, Cameron, OF & P's representative, allegedly repeated the defamatory statements from the letter. Moreover, plaintiff claims that during cross-examination Cameron "intensified his attack" on plaintiff by asking him to name all the attorneys he had consulted in connection with his claims against Lake Manassas. When he hesitated, plaintiff claims that Cameron "ridiculed" him for his inability to recall their names. No other defamatory statements are specifically alleged in the complaint. Following the hearing, the arbitration panel denied plaintiff's claim for a refund of any fees paid to OF & P and directed that its decision would be enforceable in accordance with the Virginia Arbitration Act.

A year later, plaintiff filed this diversity action on June 28, 2004, asserting a claim for defamation under Virginia law and demanding compensatory and punitive damages due to loss of reputation and standing in the community, embarrassment, humiliation and mental suffering. On July 19, 2004, defendant filed a motion to dismiss the case, arguing that (i) a majority of the claims are barred by Virginia's one-year statute of limitations on actions for defamation, (ii) any alleged defamatory statements not time-barred are protected by absolute or qualified privilege, and (iii) the alleged statements are not actionable under Virginia law. The parties fully briefed the issues raised in defendant's dismissal motion and the matter was properly noticed for hearing on August 13, 2004. Plaintiff did not appear on that date, apparently owing to poor health, and hence no oral argument was heard. Instead, because the issues and governing authorities are adequately set forth in the parties' pleadings and briefs, oral argument is unnecessary and the matter is appropriately resolved on the papers.

## II.

### A. Statute of Limitations

 The first question presented is whether Virginia's one-year statute of limitations [4] operates to bar all or any of the alleged defamatory statements, which temporally fall into two categories: (1) those contained in OF & P's June 28, 2002 letter to the arbitration board and (2) those uttered by OF & P lawyers in the course of the June 30, 2003 arbitration proceeding. Because plaintiff filed this action on June 28, 2004, it is clear that any defamatory statements made more than one year prior to this date are barred by the one-year statute of limitations. This is so because in Virginia, a tortious cause of action arises on the date the injury is sustained, or, in the case of a defamation cause of action, on the date of publication. *See* Va.Code. § 8.01–230; *Shands,* 255 Va. at 498, 500 S.E.2d 215 ("Any cause of action that the plaintiff may have had for defamation against any of the defendants accrued on ... the date she alleges ... that the defamatory acts occurred."). It follows, therefore, that plaintiff's claims based on the statements in OF & P's June 28, 2002

---

**4.** A federal court sitting in diversity must apply the law of the state in which it sits, including the state's choice of law rules. *See Van Dusen v. Barrack,* 376 U.S. 612, 637–38, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). In tort actions, it is well-settled that Virginia applies the rule of *lex loci delicti,* or the law of the place of the wrong. *See Milton v. IIT Research Inst.,* 138 F.3d 519, 521 (4th Cir.1998) (applying Virginia law in tort action because Virginia was the place of the wrong); *Jones v.* *R.S. Jones & Assoc.,* 246 Va. 3, 5, 431 S.E.2d 33 (1993) (affirming that Virginia's choice-of law rule in tort actions remains the law of the place of the wrong). Thus, because all statements at issue in this case were allegedly published in Virginia, Virginia's one-year statute of limitations applies. *See* Va.Code § 8.01–247.1; *Jordan v. Shands,* 255 Va. 492, 497–98, 500 S.E.2d 215 (1998) (plaintiff's defamation claim barred by one-year statute of limitations).

letter are barred as they were made more than one year (indeed exactly two years) prior to the filing of this action.[5] By the same token, plaintiff's defamation claims based on statements made in the arbitration hearing are not barred by the statute of limitations because they occurred within the one-year limitations period.

Plaintiff raises several arguments in an effort to avoid the conclusion that the statute of limitations period bars any defamation claims based on the June 28, 2002 letter. Yet, closely examined, none of these arguments succeeds.

First, plaintiff argues that, without respect to the date the letter was sent, the statute of limitations did not begin to run until the arbitration panel read the letter on the date of the hearing, June 30, 2003. Relying presumably on an inference that the arbitrators never reviewed the file prior to the hearing, plaintiff argues that the letter's effective publication date was not until the June 30, 2003 hearing, which would fall barely within the one-year statute of limitations.

To be sure, publication of a defamatory statement requires that it be communicated to a third party "so as to be heard and understood by such person." *Thalhimer Bros. v. Shaw*, 156 Va. 863, 871, 159 S.E. 87 (1931). Thus, a mailed letter is not published if it is never opened or read by anyone; publication requires that the letter be received and opened so that it may be read and understood by a third party. Yet, despite this clear rule, it is possible for publication to be complete long before a letter is read by its addressee or ultimate recipient. Publication does not require that the addressee read the letter; rather, publication is complete upon dissemination to *any* third party. In the words of the Supreme Court of Virginia, " 'the mere depositing of a letter containing such matter in the post office would be a publication of it, although it never came to the hands of him for whom it was intended, if it came to those of *anyone else* .... ' " *See Davis v. Heflin*, 130 Va. 169, 172, 107 S.E. 673 (1921) (emphasis added) (quoting 18 Am. & Eng. Enc. 1015 (2d ed. 1896)). For example, courts have long recognized that a defamatory statement is published the moment it is delivered to a telegram company. This is so because, although the statement has not yet been transmitted to its ultimate recipient, at that moment it has been delivered to a third party—the employee of the telegram company who received the letter. *See, e.g., Munson v. Lathrop*, 96 Wis. 386, 387, 71 N.W. 596 (1897); Restatement (Second) of Torts § 557 cmt. g. (1977) ("One who delivers a defamatory message in a written form to a telegraph company for transmission by that act publishes a libel to the

---

5. Plaintiff allegedly did not receive a copy of the June 28, 2002 letter until November, 2002, although OF & P claims to have faxed and mailed the letter promptly at the end of June. Regardless, the date plaintiff learned of the defamatory statement is not relevant to the statute of limitations analysis. In Virginia, an action for defamation arises on the date the injury is sustained, not the date the resulting damage is discovered. *See* Va.Code § 8.01–230 ("In every action for which a limitation period is prescribed, the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of

injury to the person or damage to property ... and not when the resulting damage is discovered ...."). Although the Virginia General Assembly has explicitly defined a few exceptions to this rule, *see, e.g.,* Va.Code § 8.01–245 (suits against fiduciaries); § 8.01–249 (fraud, malicious prosecution, and others), it has declined to adopt a discovery rule in defamation actions. Nevertheless, even if defendant did not send the position statement to the arbitration panel until November 2002, as long as the panel received it shortly thereafter, plaintiff would still be nearly seven months late in filing this suit for damages arising from statements in that letter.

employee of the company who receives it, and to every employee to whom it is subsequently communicated ....."). In contrast, although a sealed letter sent by United States mail is not published upon delivery to a postal worker, unless the defamatory statement is written on the outside of the envelope, it too may be published before delivery to the ultimate addressee if opened and read by some other third party. Thus, if a letter is delivered to an organization, it is published when first received and read by any member of that organization, whether it is a mail room worker, a secretary, a clerk, or the addressee himself. In this case, therefore, although it is conceivable the members of the panel might have read the letter for the first time at the June 30, 2003 arbitration hearing, the hearing date is not the effective date of publication; rather, it is the date the letter was received and processed by an employee or representative of the arbitration panel.

Plaintiff does not allege in the complaint the exact date a representative of the arbitration panel first received and opened the June 28, 2002 letter, but the date of receipt may be deduced from the date the letter was mailed. Courts have sensibly recognized in other contexts that "[t]he law presumes delivery of a properly addressed piece of mail." *McPartlin v. Commissioner*, 653 F.2d 1185, 1189 (7th Cir.1981) (rejecting petitioners' application for redetermination of tax deficiency despite their argument they had not received notice of the deficiency until eight years after judgment). On a similar rationale, pleadings served by mail are presumed to reach their destination within a short time of when they are sent and, thus, service is considered complete upon mailing. *See* Fed.R.Civ.P. 5(b)(2); *see also* Fed.R.Civ.P. 6(e) [6] (three-day extension to any prescribed period after service by mail still limited to short and reasonable time). Similarly, in the employment discrimination context, when the parties have disputed the date of *receipt* of Title VII "right-to-sue" letters, which initiate a ninety-day limitations period during which a plaintiff must bring suit or fail to exhaust his administrative remedies,[7] courts have relied on Rule 6(e), Fed.R.Civ.P., to establish a presumption that the letter was received between three and seven days after the date mailed. *See Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 148, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (presuming receipt of right to sue notice three days after mailing when parties disputed date of receipt and citing Rule 6(e)); *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir.2002) (citing a range of cases presuming dates of receipt between three and seven days after date of mailing); *Griffin v. Prince William Hosp. Corp.*, 716 F.Supp. 919, 922 n. 7 (E.D.Va.1989) (adopting three-day period from Rule 6(e)). In these cases, courts have not permitted plaintiffs to avoid a motion to dismiss for failure to exhaust administrative remedies simply because the date of receipt of the letter was unknowable or in dispute. *See e.g., Taylor*, 296 F.3d at 379–80. Thus, on a motion to dismiss, once a letter is mailed, its receipt may be presumed within a rea-

---

**6.** Rule 6(e), Fed.R.Civ.P., provides that "[w]henever a party has the right or is required to do some act or take some proceedings within a prescribed period after service of a notice or other paper upon the party and the notice or paper is served upon the party [by mail], 3 days shall be added to the prescribed period." Fed.R.Civ.P. 6(e).

**7.** The Supreme Court has often referred to Title VII's ninety-day filing period after receipt of a "right-to-sue" letter from the EEOC as a statute of limitations. *See Zipes v. TWA*, 455 U.S. 385, 395 n. 12, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).

sonable time, equivalent to that normally required for a letter to pass through the mail.

Neither party disputes that the June 28, 2002 letter was mailed long before June 28, 2003, the pivotal date one year before plaintiff filed his claim. Moreover, the letter itself reflects that it was faxed and mailed on June 28, 2002 to the Chairperson of the Arbitration Committee.[8] And significantly, plaintiff in his complaint never alleges that the letter was not sent on or about June 28, 2002, nor does he dispute that it was received and opened a few days later.[9] Plaintiff does allege, however, that he did not receive his *own copy* of the letter until November 2002. Yet, even assuming the letter was not mailed to the arbitration panel until November 2002, it is still reasonably presumed that the arbitration panel received the letter approximately three days after it was mailed, still some seven months prior to the arbitration proceeding and long before June 28, 2003.

■ Plaintiff's second attempt to escape the statute of limitations also fails. He argues that OF & P's oral repetition at the hearing of written statements included in the June 28, 2002 letter constituted an ongoing tort, resulting in suspension of the statute of limitations between the date the letter was received and the date of the hearing. Yet, contrary to plaintiff's contention, it is well-settled that "repeated defamations do not constitute a continuing tort." *Lewis v. Gupta*, 54 F.Supp.2d 611, 616 (E.D.Va.1999) (citing cases). Rather, "as courts have uniformly recognized, each separate defamatory statement itself constitutes a separate and distinct cause of action." *Id.* Thus, any defamation claim for statements in the June 28, 2002 letter arose when the letter was opened and read, at which time the one-year limitations period commenced to run and then expired one year later. A separate one-year limitations period commenced to run with respect to any allegedly defamatory oral statements uttered at the June 30, 2002 hearing. But, plaintiff may not simply extend the statute of limitations on his claim for the first set of statements contained in the letter, or revive such action, by identifying similar oral statements made later.

■ Finally, to avoid the conclusion that his defamation action is time-barred, plaintiff argues that every distinct viewing of the letter, first upon its receipt and then again at the arbitration hearing, constitutes a separate publication and, thus a new cause of action. If correct, a new statute of limitations would begin to run

---

**8.** Facts contained in the June 28, 2002 letter may be considered here, despite the fact that plaintiff did not attach the letter to his complaint, because plaintiff extensively relies upon it in stating his claims. *See supra* note 3.

**9.** Plaintiff's complaint contains no allegation that the letter remained unopened by the arbitration panel, a clerk, or some other representative for an entire year until the June 30, 2003 hearing, nor could he make such an allegation consistent with Rule 11. *See* Fed. R.Civ.P. 11(b)(3) ("By presenting to the court ... a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."). Plaintiff does seemingly allege in his opposition to defendant's motion to dismiss that the panel opened and read the letter for the first time at the hearing, but it is also "axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Morgan Distrib. Co., Inc. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir.1989) (citation omitted); *see also Davis v. Cole*, 999 F.Supp. 809, 813 (E.D.Va.1998) (refusing to consider additional allegations in response to motion to dismiss).

upon each instance of republication, reviving plaintiff's claim and giving him an additional year to file suit. Thus, plaintiff could claim that a new statute of limitations began to run when the panel members re-read the statements in the June 28, 2002 letter on June 30, 2003. Again plaintiff's objection fails. Virginia follows the "single publication rule," which permits only one cause of action to be maintained for any single publication, even if heard or read by two or more third persons. *See Morrissey v. William Morrow Co.*, 739 F.2d 962 (4th Cir.1984); *see also* Restatement (Second) of Torts § 557A(4) (1997).[10] Although subsequent distribution of a defamatory statement may continue to increase plaintiff's compensable damages, it does not create independent actions or start the statute of limitations running anew. *See Zuck v. Interstate Publishing Corp.*, 317 F.2d 727, 729–30 (2d Cir.1963) (holding that publication of libelous newspaper gave rise to a single cause of action accruing once upon distribution to the public). In *Semida v. Rice*, 863 F.2d 1156 (4th Cir.1988), the Fourth Circuit reasoned that a defamatory letter had not been "republished" when a USAID worker in the Washington, D.C. office merely sent a copy of a file containing the letter to an office in Somalia, even though the transmission exposed the defamatory statements to still another third person. *Id.* at 1161. In this regard, the court ruled that a copy of a letter, read by several people, is no different from multiple copies of a book or magazine article read by thousands, and accordingly should be considered as a single publication, rather than a republication of the original defamatory letter. *Id.* Thus, the *Semida* court rejected the argument that a new limitations period began to run

when an additional copy was sent to the foreign office, finding instead that the statute of limitations began to run upon the date the letter was first distributed to USAID. *Id.*

Similarly, plaintiff in this case may only maintain a single cause of action arising out of the June 28, 2002 letter. Moreover, the statute of limitations on that claim began to run the day the letter was received by the arbitration panel and cannot be tolled or extended. Assuming, *arguendo*, that plaintiff could establish a valid claim based on the June 28, 2002 letter and that it was not barred by the statute of limitations, he might be able to establish additional damages owing to the republication of the letter on the date of the hearing. In other words, a republication does not restart the limitations period, but the extent of republication may affect the extent of the alleged injury to reputation. In sum, plaintiff may not resurrect his stale claim based on the June 28, 2002 letter merely because the letter was read by additional third parties on a later date. Therefore, any claim arising out of statements contained in the June 28, 2002 letter is time-barred by Virginia's statute of limitations and must be dismissed.

### B. Absolute Privilege

The next step in the threshold analysis of plaintiff's defamation claims is to address whether Virginia accords an absolute privilege to statements made in the context of an arbitration proceeding. It is well-settled that words spoken or written in a judicial or quasi-judicial proceeding are absolutely privileged when relevant to the subject matter of the proceed-

---

**10.** Although the Supreme Court of Virginia still has not formally addressed this issue, the Fourth Circuit has repeatedly upheld the conclusion that Virginia would follow the great majority of states that now embrace the "sin-

gle publication rule." *See Morrissey v. William Morrow Co.*, 739 F.2d 962 (4th Cir. 1984); *Semida v. Rice*, 863 F.2d 1156, 1161 (4th Cir.1988).

ing. *See Shabazz v. PYA Monarch, LLC,* 271 F.Supp.2d 797 (E.D.Va.2003) (citing *Darnell v. Davis,* 190 Va. 701, 707, 58 S.E.2d 68 (1950)).[11] This sensible rule follows from the crucial interest in ensuring free and full disclosure of information and exchange of views by parties to a dispute. The interest that parties not be deterred or chilled by the threat of a defamation suit outweighs an individuals' interest in preserving his reputation untarnished. And importantly, this absolute privilege is not restricted to civil and criminal court proceedings, *see Penick v. Ratcliffe,* 149 Va. 618, 627–28, 140 S.E. 664 (1927); rather, it is clear that in Virginia and elsewhere the privilege also extends to proceedings of a quasi-judicial nature with attributes similar to those of court proceedings.[12] In the words of the Supreme Court of Virginia,

> The rule is broad and comprehensive, including within its scope all proceedings of a judicial nature whether pending in some court of justice, or before a tribunal or officer clothed with judicial or quasi judicial powers. It applies to communications made before tribunals having attributes similar to those of courts.

*Id.* (citation and quotation omitted).

Nor is there any doubt that the arbitration procedure here in issue is sufficiently similar to a judicial proceeding to warrant the application of an absolute privilege to all statements made in connection with such a proceeding. Particularly instruc-tive in this regard is *Corbin v. Washington Fire & Marine Ins. Co.,* 278 F.Supp. 393 (D.S.C.1968), *aff'd,* 398 F.2d 543 (4th Cir. 1968), which extended the absolute privilege to testimony and argument presented during the course of an insurance arbitration. In affirming the district court's application of the privilege to this arbitration, the Fourth Circuit reasoned that arbitration proceedings, like judicial proceedings, "cannot proceed without evidence and the right of the parties to present argument; it cannot operate in a vacuum," and thus, to deny immunity to parties offering evidence in an arbitration proceeding "would be a severe limitation on the utility of arbitration in resolving controversies and would thwart that public policy which encourages arbitration." *Id.* at 396–97. Accordingly, the Fourth Circuit sensibly concluded that the "[f]reedom to develop a relevant record and to present pertinent arguments, without fear of reprisal by way of threatened libel or slander actions, is a necessary prerequisite to the fair resolution of any controversy through arbitration." *Id.; see also Odyniec v. Schneider,* 322 Md. 520, 534–35, 588 A.2d 786 (1991) (applying absolute privilege to health claims arbitration because society's interest in unfettered speech during proceeding outweighed interest of individual potentially defamed).

It is also worth noting that the application of the absolute privilege to arbitration proceedings is entirely consistent with the

---

**11.** The absolute privilege applies only to statements relevant to the proceedings, but the concept of relevancy is to be "liberally construed." *See Mock v. Chicago, R.I. & Pac. R.R.,* 454 F.2d 131, 135 (8th Cir.1972) (citing W. Prosser, Torts § 114 (1971 ed.)). Even under a restrictive test of relevancy, however, OF & P's alleged statements at the hearing and in its position statement were relevant to the history of the relationship between OF & P and plaintiff, and thus sufficient to satisfy this requirement.

**12.** *See, e.g., Mock,* 454 F.2d 131 (applying absolute privilege to proceedings before Na-tional Railroad Adjustment Board); *Hawthorne v. Washington Metro. Area Transit Auth.,* 702 F.Supp. 285 (D.D.C.1988) (applying absolute privilege to proceedings before Office of Unemployment Compensation board); *Tallman v. Hanssen,* 427 N.W.2d 868 (1988) (applying absolute privilege to worker's compensation proceeding). *But see Englewood v. Daily,* 158 Colo. 356, 407 P.2d 325 (1965) (holding that legislative annexation proceeding was ministerial, not quasi-judicial in nature).

great weight of authority applying the privilege more generally to quasi-judicial proceedings. For example, in its determination that proceedings before the National Railroad Adjustment Board (NRAB) are quasi-judicial in nature, the Eighth Circuit noted that the term is generally applied to administrative proceedings that involve (i) the exercise of discretion in the application of legal principles to varying factual situations and (ii) notice and a hearing. *See Mock v. Chicago, Rock Island & Pac. R.R. Co.*, 454 F.2d 131, 134 (8th Cir.1972) (citing cases). Reflecting the many parallels to the rules that govern arbitration proceedings, the Act establishing the NRAB provides that notice be given to the parties prior to hearing the dispute, and authorizes the Board to conduct hearings. *Id.* And, the Act further requires (i) that the Board furnish written findings to the parties, (ii) that awards of the Board will be final and binding, and (iii) that with the exception of narrowly-defined circumstances, the awards are conclusive in later judicial proceedings. *Id.* Similarly, in a recent case applying Virginia law, the court correctly held that proceedings before the EEOC are quasi-judicial in nature, warranting the application of the privilege. *Shabazz v. PYA Monarch, LLC,* 271 F.Supp.2d 797, 803 (E.D.Va. 2003). In reaching this result, the court emphasized the EEOC's power to subpoena documents, information and witnesses, and its power to file a lawsuit at the conclusion of the proceedings. *Id.*

As an illustrative contrast, in *Elder v. Holland,* 208 Va. 15, 155 S.E.2d 369 (1967), the Supreme Court of Virginia refused to extend the absolute privilege to a departmental hearing before the Superintendent of the Virginia State of Police. *Id.* at 22, 155 S.E.2d 369. Importantly, the court found that the safeguards that commonly surround a judicial proceeding, like the ability to issue subpoenas or to require testimony under oath and the threat of

perjury, did not accompany the hearing in question. *Id.* Thus, in balancing the interests of public servants to be free to testify at departmental hearings and the interest of citizens whose reputations have been defamed, the court found that the best adjustment was to afford merely a qualified privilege. *Id.* Nevertheless, the court affirmed that where a proceeding is conducted "with safeguards similar to a judicial proceeding and when it [deals] with issues of significant public concern there would ... be no basis for refusing to invoke the doctrine of absolute privilege ...." *Id.* at 21, 155 S.E.2d 369 (citation omitted).

■ These settled principles of Virginia law, applied here, compel the conclusion that the attributes of fee arbitrations are sufficiently similar to judicial proceedings such that there is a firm basis for applying the absolute privilege in the arbitration context. In this respect, it is apparent that the fee arbitration proceeding more closely resembles judicial or quasi-judicial proceedings, for which application of the absolute privilege is warranted, than the informal departmental hearing discussed in *Elder,* which does not warrant application of the absolute privilege. Indeed, an examination of the attributes of a fee arbitration under Virginia law confirms its close resemblance to the typical court proceeding. Thus, the fee arbitration is a voluntary alternative to filing a civil lawsuit, and results in a binding, final decision that is enforceable by the circuit court. *See* Virginia Uniform Arbitration Act, Va. Code §§ 8.01–581.01–.16. Moreover, like any judicial proceeding, both parties are given notice of the proceeding, have the opportunity to present evidence, to be represented by counsel, to subpoena documents, information and witnesses and are subject to a binding and enforceable decision. *See* Fee Dispute Resolution Program, Virginia State Bar, *Program Rules,* R. 10, 16, 18 (2003). It is true, of course,

that arbitration proceedings often do not observe many of the evidentiary formalities enforced in judicial proceedings, but these distinctions do not in any way limit the need for frank, open, and honest exchange in all parts of an arbitration proceeding. Not surprisingly, therefore, courts have not emphasized evidentiary and pleading rules when determining that a proceeding is quasi-judicial in nature; instead, they have stressed elements associated with notions of due process, such as requirements for notice, a hearing, and the ability to marshal and present evidence. *See e.g., Mock*, 454 F.2d at 134 (emphasizing requirements of notice, hearing, and exercise of discretion to determination of quasi-judicial proceeding). With respect to notions of due process, the rules that govern arbitration and court proceedings are essentially the same, from which it follows that both types of proceedings warrant the protection of the absolute privilege.

A contrary rule resulting in the failure to cloak arbitration proceedings with an absolute privilege for defamatory statements would have a chilling effect on arbitration proceedings. In this event, parties would face the decision to file a civil lawsuit, where they would be absolutely protected from lawsuits for erroneous and defamatory assertions, or to submit to the typically less expensive and more expeditious arbitration proceeding where they would incur the risk of an additional defamation lawsuit for statements made in the context of the arbitration. Parties presented with such a decision would likely be discouraged from selecting arbitration, a result that would defeat the very rationale for providing alternative methods of dispute resolution.

Therefore, it is clear in this case that all statements uttered on June 30, 2003 before the arbitration panel are protected by the absolute privilege. It is also clear that the absolute privilege applies not only to oral statements addressed to a quasi-judicial body, such as the arbitration panel, but also more broadly to other relevant written and oral communications made in the course of the proceedings. *See, e.g., Kelley v. Bonney*, 221 Conn. 549, 571, 606 A.2d 693 (1992) (allegations in a complaint); *Id.* at 573, 606 A.2d 693 (lawyer questioning potential witness before trial); *Rodgers v. Wise*, 193 S.C. 5, 7 S.E.2d 517 (1940) (communications between counsel); *Petty v. Gen. Accident Fire & Life Assurance Corp.*, 365 F.2d 419, 421 (3rd Cir.1966) (statements in the course of a settlement negotiation). As the privilege has been expanded to embrace other statements in furtherance, and in the course, of judicial proceedings to encourage robust and open discussion throughout the entire process, there is no reason to apply the absolute privilege more narrowly to quasi-judicial proceedings. Thus, the privilege applies not only to statements made during an arbitration proceeding, but also to written and oral statements made in furtherance of the arbitration. Therefore, even if plaintiff's defamation claim arising out of the June 28, 2002 letter to the arbitration panel were not barred by the statute of limitations, it, too, would be protected by the absolute privilege. In sum, because plaintiff only alleges defamatory statements uttered or written in contexts directly related to the arbitration proceeding itself, all of his claims are barred by an absolute privilege.[13]

---

**13.** Because all statements alleged in plaintiff's complaint are protected by an absolute privilege, it is not necessary to reach defendant's qualified privilege defense. Yet, even were the absolute privilege not applicable in arbitration proceedings, a qualified privilege would nonetheless apply, in which event the

### C. Failure to State an Actionable Defamation Claim

 Finally, even if plaintiff's claims were not barred by the statute of limitations or an absolute privilege, plaintiff has failed to identify any actionable statements upon which to state a claim. Under Virginia law, to state a claim for defamation, plaintiff must show (1) publication, (2) of an actionable statement with (3) the requisite intent. *Chapin v. Knight–Ridder, Inc.,* 993 F.2d 1087, 1092 (4th Cir. 1993). To be "actionable," a statement must be a false assertion of fact that "tend[s] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* Stated differently, defamatory words are those that "make the plaintiff appear odious, infamous, or ridiculous," not "[m]erely offensive or unpleasant statements." *Id.* (citation omitted); *see also* R. Sack, Libel, Slander and Related Problems § 2.4.1 (1980) ("There is common agreement that a communication that is merely unflattering, annoying, irksome, or embarrassing, or that hurts the plaintiff's feelings, without more, is not actionable."). Furthermore, a statement cannot be actionable as defamatory if it "cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (internal quotation and citation omitted); [14] *see also Yeagle v. Collegiate Times,* 255 Va. 293, 295, 497 S.E.2d 136 (1998) ("[S]peech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action."). In Virginia, whether a statement is actionable as defamatory is a matter of law for the trial judge to determine. *Chapin,* 993 F.2d at 1092.

 Measured by these standards, all the alleged defamatory statements in the complaint fall short. First, the fact that some of the alleged statements may have been false, without more, is not sufficient to maintain a cause of action for defamation. For example, plaintiff objected to written accusations that he had agreed with Laufer to obtain a second opinion from OF & P. It may be true that plaintiff objected to this course of action, but a statement to the contrary cannot serve to damage his reputation in the community. In other words, the statement may be false, but it does not serve to make him appear "odious, infamous, or ridiculous." *Chapin,* 993 F.2d at 1092. Indeed, plaintiff's remedy to challenge any falsehoods or misstatements was to present contrary evidence at the arbitration proceeding.

plaintiff would be required to allege not only defamatory statements, but actual malice on the part of the defendant in making the statements. *See Holland,* 208 Va. at 23, 155 S.E.2d 369 (applying qualified privilege to informal hearing before Superintendent of Virginia State Police and remanding to permit plaintiff to make a showing of actual malice). Plaintiff makes no such allegation in his complaint and he may not allege such malice in his opposition to defendant's motion to dismiss. *See Morgan Distrib. Co., Inc. v. Unidynamic Corp.,* 868 F.2d 992, 995 (8th Cir.1989) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposi-

tion to a motion to dismiss."). In any event, the absolute privilege here is dispositive.

**14.** Speech which does not contain a provably false factual connotation is sometimes referred to as "pure expressions of opinion." *See, e.g., Williams v. Garraghty,* 249 Va. 224, 233, 455 S.E.2d 209, 215 (1995). Nevertheless, the Supreme Court has explicitly declined to fashion a categorical exclusion "for anything that might be labeled opinion" as the basis for a common law defamation cause of action. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18–21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

After failing to prevail in the arbitration proceeding, he may not now resurrect aspects of that dispute in the guise of a defamation action.

 Conversely, a statement that is damaging to one's reputation cannot be defamatory if it is not false. Truth does not defame. OF & P's efforts to impeach plaintiff's motives by suggesting that he had previously disagreed with other attorneys and demanded that they return his money may portray plaintiff in a negative light, but this is not a false statement of fact. Plaintiff concedes that he previously disagreed with his attorney's judgment and that he refused to pay Laufer for OF & P's second opinion. Thus, even if the statement's tone was insulting or ridiculing, it cannot be defamatory if the substance is true. *See, e.g., Briarcliff Lodge Hotel v. Citizen–Sentinel Publishers,* 260 N.Y. 106, 118–19, 183 N.E. 193 (1932) ("Facts do not cease to be facts because they are mixed with the fair and expectant comment of the story teller, who adds to the recital a little touch of the piquant pen.").

 Finally, plaintiff objects to an "attack" during cross-examination when OF & P's attorney asked him to name all attorneys he had consulted in connection with his claim against Lake Manassas. While this interchange may have embarrassed him or made him feel uncomfortable, this is the nature of cross-examination. If plaintiff was embarrassed because he could not, or would not recall, their names, this is not defamation. A plaintiff may not resort to the courts every time he is put off or offended by the statements of another.

Because plaintiff has failed to allege any actionable statements in his complaint, and a review of the June 28, 2002 letter has failed to uncover any additional statements that are arguably defamatory, plaintiff has failed to state a claim for defamation upon which relief may be granted.

### III.

In sum, plaintiff's defamation claims must be dismissed. Those statements not barred by Virginia's statute of limitations are absolutely privileged as they were uttered during the course of a quasi-judicial fee arbitration proceeding. A fee arbitration, as an alternative to a civil lawsuit, requires the same protections for free and robust communication as a formal judicial proceeding. Yet, even if plaintiff's claims were not barred, the statements alleged do not rise to the required standard to be actionable as defamation. Plaintiff's complaint against defendant must be dismissed.

An appropriate order will issue.